### Alice Bullis v. Presidio Mining Company et al.

#### No. 7035.

1. **Extension of Contract for Sale of Land by Parol.**—The time for the performance of a contract for the sale of land may be extended by a verbal agreement.

2. **Statute of Frauds.**—Where a valid contract for the sale of land was made and the time of performance had been extended, but negotiations and work under the contract had been abandoned, and a new contract agreed upon different in material parts from the first, and relating to a part of the subject matter of the first, the new contract having been reduced to writing and its terms agreed upon, but the vendor refused to sign it; *held:*

1. That such new contract was in no wise an extension of the first.

2. That it was invalid under the statute of frauds.

3. That labor and money expended under the new contract could not be considered as expended in part performance of the original contract.

4. In an action between the parties for specific performance, the negotiations and acts under the original contract are irrelevant to the controversy, as dependent upon the new and final parol contract.

5. A charge submitting as a basis for specific performance acts and declarations prior to the second agreement was improper.

3. **Community Property.**—Where the pleadings and the testimony treat and show the land to be community property, the court properly charged the jury to so consider it.

4. **Irrelevant Issues.**—That another corporation was engaged upon adjoining lands in operations affecting the value of the property in litigation can have nothing to do with the question of the rights between the parties to it, although parties litigating are stockholders in such corporation.

Appeal from Presidio. Tried below before Hon. T. A. Falvey. The opinion states the case.

*Wm. Aubrey,* for appellant.— 1. To extend a written contract con-

cerning lands a written promise or undertaking is required. Rev. Stats., art. 2464; Stowell v. Robinson, 3 Bing., 390; Avery v. Kellogg, 11 Conn., 575; Doar v. Gibbes, 1 Bail. Eq., 371; Castro v. Illies, 13 Texas, 233.

2. To operate an estoppel the representation relied on must be absolute and unconditional, and must relate not to the future but to a present or past state of facts. Edwards v. Dickson, 66 Texas, 613; Big. on Estop., 555, 559, and cases cited.

3. The court erred in charging the jury "that in their consideration of the case, as between John L. Bullis and defendants, they should treat the land in controversy as the community property of said John L. Bullis and his deceased wife Alice Bullis, and not as the separate property of said Alice Bullis," for this:

(1) It was a mixed question of law and fact, from the pleadings and evidence in this case, whether said property was or was not the separate property of Mrs. Bullis.

(2) If in fact and in law the property was the separate property of Mrs. Bullis, the plaintiff John L. Bullis, unless an estoppel had been established against his wife as well as himself, would have been entitled to receive one-half of the property herein sued for.

(3) It was neither pleaded (except by defendants), admitted, nor proved that the land in controversy was the community property of Bullis and wife, and the allegation of defendants to that effect is taken, under our rule of practice, as specially denied. Fitts v. Fitts, 14 Texas, 454; Reynolds v. Lansford, 16 Texas, 294; Story v. Marshall, 24 Texas, 307; Higgins v. Johnson, 20 Texas, 395; Smith v. Boquet, 27 Texas, 513; Peters v. Clements, 46 Texas, 125; Garca v. Galvan, 55 Texas, 53; Baker v. Baker, Id., 578; Morrison v. Clark, Id., 444; Bradshaw v. Mayfield, 18 Texas, 21; Coats v. Elliott, 23 Texas, 613; Barziza v. Graves, 25 Texas, 324; Kendrick v. Taylor, 27 Texas, 698; McAlpine v. Burnet, 23 Texas, 650.

4. A promise to sign is not equivalent to an execution of an instrument.

5. The court erred in entering judgment upon the verdict of the jury for this:

(1) The said verdict, on account of its vagueness and unintelligibility, did not warrant the judgment rendered.

(2) Said judgment fails to order a delivery of the money and stock held by the clerk to the plaintiff.

(3) Said judgment treats as a complete fulfillment of the obligations imposed upon Cook and his associates by contract (Exhibit B) the deposit by the Presidio Mining Company with the clerk of $1600 cash and 5000 of its shares, though Exhibit B does not call for the shares of a California corporation.

(4) Said judgment is based upon the error committed by the jury in

treating Exhibit B and the so-called extension as one and the same thing, when they were and are different, and entail different obligations and responsibilities.

(5)   Said judgment is inconsistent with its own terms, since after vesting title in Bullis and the defendants to the land in controversy jointly, it then divests title out of said Bullis and in the said Presidio Mining Company to the same land.   Jackson v. The State, 21 Texas, 668; Claiborne v. Tanner, 18 Texas, 68; McKey v. Welch, 22 Texas, 390.

*W. S. Wood*, and *Davis, Beall & Kemp*, for Presidio Mining Company, and *A. H. Willie*, of counsel.—1.   It was competent for appellant to enlarge the time for performance of the contract, or to waive performance by parol agreement, and testimony showing that appellant, by his acts and declarations prior to any forfeiture, did enlarge or extend the time for or waive performance was properly admitted.   The evidence was admissible to show a waiver on the part of Bullis of right to claim that the contract had not been completed within a year from its date. It was admissible to show that Bullis misled Cook and his associates into the belief that the forfeiture was waived, and thereby induced them to continue to perform their obligation under the contract, and estopped the appellant from claiming a forfeiture for noncompliance with the same within one year.   The evidence did not vary the legal effect of the contract, nor was the agreement to enlarge the time in effect a contract to convey land, or within the statute of frauds.

2.   It was competent for the parties by parol agreement to consent to the abandonment of section six and its elimination from the contract. The action of Bullis in consenting to such abandonment, and in allowing the expenditure of money on section eight by the vendees under the supposition that section six was in fact abandoned, precludes him from now objecting to the validity of the oral consent thereto.

3.   The waiver or extension is claimed upon two grounds:

(1)   By reason of statements and declarations made by Bullis to the effect that he would not insist upon a performance within the year, but would want the prospecting and the development of the mine to continue after that time, and would allow six months for that purpose after the expiration of the contract.

(2)   By reason of promises made by Bullis to sign a contract in which an agreement to make such extension for six months was contained.

4.   Appellant's second charge is faulty in confining the force of the extension paper wholly to the signature of Bullis.   It was of force without a signature, and binding if the facts and circumstances connected with it tended to establish an estoppel or to show that refusal to sign it was a fraud on the vendees.

5. The organization and acts of the Cibolo Creek Mill and Mining Company had nothing to do with this transaction.

6. The verdict is sufficient. 1 Sayles' Civ. Stats., art. 1334; Burton v. Anderson, 1 Texas, 93; Burton v. Bondies, 2 Texas, 204; James v. Wilson, 7 Texas, 230; Willis v. Barnett, 7 Texas, 584; Moke v. Fellman, 17 Texas, 367; Pearce v. Bell, 21 Texas, 688; Loggins v. Burck's Admrs., 33 Texas, 113; Secrest v. Jones, 30 Texas, 596; Campbell v. Evarts, 47 Texas, 102; Gaines v. Bank, 64 Texas, 18; Wood v. Welder, 42 Texas, 397; Newcomb v. Walton, 41 Texas, 318; Picket v. Richet, 2 Bibb, 178, 179.

7. A court of review will refuse to set aside a verdict because of error in the charge of the court below, where the verdict is manifestly correct. Salinas v. Wright, 11 Texas, 572; Hollingsworth v. Holshousen, 17 Texas, 41; Merriweather v. Dickson, 28 Texas, 15; Carter v. Eames, 44 Texas, 548; Loper v. Robinson, 54 Texas, 516; Gaston v. Dashiell, 55 Texas, 508; Galveston v. Morton, 58 Texas, 409.

HENRY, ASSOCIATE JUSTICE.—The original petition in this cause was filed in the District Court on the 6th day of March, 1885, by Alice Bullis and her husband John L. Bullis, against the Presidio Mining Company, a corporation organized under the laws of the State of California, and William Noyes, as defendants.

The suit was for partition of section 8, in block 8, of surveys made in Presidio County by virtue of certificate issued to the Houston & Texas Central Railway Company.

The plaintiff Alice Bullis claimed to own in her separate right an undivided one-fourth of the survey, and the petition alleged that the mining company owned the other three-fourths interest by purchase from William R. Shafter, Louis Wilhelmi, and John W. Spencer.

A copy of a lease marked Exhibit B was made a part of plaintiff's pleadings, which reads as follows:

"EXHIBIT B.

"Agreement made and entered into this 8th day of June, 1882, between Colonel William R. Shafter, Lieutenant Louis Wilhelmi, John W. Spencer, of Presidio County, and Mrs. Alice Bullis (wife of Lieutenant J. L. Bullis), of Bexar County, all of the State of Texas, their heirs, administrators, assigns, etc., parties of the first part, and Daniel Cook, of the city of San Francisco, State of California, his heirs, administrators, assigns, etc., party of the second part, witnesseth: That the said parties of the first part do hereby and by these presents bond for the term of one year, unto the said party of the second part, the following described mineral lands situated in Presidio County, State of Texas: Survey number 6, block number 8, surveyed for the Houston & Texas Central Railroad Company, beginning at the southeast corner of survey number 1, block number 8, Presidio County, made for the Houston &

Texas Central Railroad Company, thence east 1900 varas, thence north 1900 varas, thence west 1900 varas, then south 1900 varas to the place of beginning; and survey number 8, block number 8, surveyed for the Houston & Texas Central Railroad Company, beginning at the northeast corner of survey number 6, made for the Houston & Texas Central Railroad Company above described, thence east 1900 varas, thence north 1900 varas, thence west 1900 varas, thence south 1900 varas to the place of beginning.

"It is further agreed that the said parties of the first part deliver unto the said party of the second part possession of the above described property, for the purpose of prospecting and developing the lands for mineral, for the period of one year, as above stated. All work to be done or necessary machinery for the purpose above stated to be paid for by the said party of the second part, and in no case shall the parties of the first part be liable for any of the expenditures made by the party of the second part. Should said party of the second part, at the expiration of one year from this date, or at any time prior, conclude, after having satisfied himself with the development of the property, to demand a deed from the said parties of the first part, then the said parties of the first part agree and bind themselves to execute and deliver to the said party of the second part a good and sufficient deed to the above described property that is now vested in them, under the following conditions, namely: That the said party of the second part will form, or cause to be formed, two separate mining companies, embracing each of the sections of land above described, the capital stock of each company to contain not less than one hundred thousand shares each; furthermore, the said party of the second part agrees to pay unto the said parties of the first part the sum of ten (10) dollars for each and every acre of land embraced in the above two surveys; and further, the party of the second part agrees to give unto the parties of the first part one-fifth of the capital stock of each of the companies mentioned, free of all assessment until all the necessary machinery is erected and paid for and the mines placed on a paying basis. It is further agreed by the party of the second part that if, after having thoroughly prospected the property, he concludes not to complete the purchase, he will surrender possession to the parties of the first part, with all work and improvements placed on the same, free of all expense to the parties of the first part.

"In witness whereof, we hereunto set our hands and seals, the day and year first above written.

> "WILLAM R. SHAFTER,
> "LOUIS WILHELMI,
> "JOHN W. SPENCER,
> "JOHN L. BULLIS,
> "ALICE BULLIS."

The petition charged that defendants entered into possession of the land under said lease, but had failed to comply with its terms.

A writ of injunction was issued against defendants upon the original petition, which still remains in force.    The cause came before this court on appeal, and is reported in 68 Texas, 581.

After the reversal of the cause the plaintiff, John L. Bullis, amended his petition in the District Court, alleging the death of his wife, after the institution of this suit, intestate and without issue or heirs of her body.    The amended petition alleges that the one-fourth undivided interest in the land sued for was acquired by purchase from the State of Texas by said John L. Bullis during the existence of his marriage with said Alice, and that though the title was taken in the name of said Alice, the purchase money was paid with community funds of the said John L. and Alice Bullis.

The pleadings of defendants also treat the interest sued for by plaintiff as the community property of himself and his deceased wife.

Plaintiff's amended pleadings charge that defendants failed to comply with the conditions of said lease within one year from the date thereof, and that they continue to hold possession of the whole of said land.

Defendants answered, praying that certain persons named and alleged to be the mother, sisters, and brother of Alice Bullis, deceased, be made parties to the suit, and scire facias making them parties was accordingly issued and served upon them.

Defendants further pleaded that Daniel Cook, in making with John and Alice Bullis the agreement called "Exhibit B," acted for himself, Seth Cook, William Willis, and John F. Boyd, and that each of them was equally interested in the subject matter thereof.

That under and in pursuance of said lease Cook and his associates entered upon the tracts of lands therein specified, and commenced to work upon and explore the same for minerals.

That soon after the entry of said parties it was found that said section 6 was not satisfactory, and the possession of the same was by consent of all parties returned to Bullis and associates, and all the conditions of the lease as to section 6 were by mutual consent waived.

That Cook and his associates continued in possession of section 8, and were then in possession of the same.

That immediately upon their entry upon section 8, Cook and his associates commenced prospecting and working therein, and so continued at great expense, and at the end of the year mentioned in said agreement had paid out and expended in the work of prospecting and developing the mineral in said land the sum of twenty-four thousand dollars or thereabouts without return.

That at or about the end of said term said Shafter, Wilhelmi, Spencer, and Bullis were anxious that Cook and his associates should not abandon

said purchase, but should continue to work on said land for an extended term of six months, in order to find sufficient mineral to induce them to complete their purchase.

That all said parties represented that at the expiration of such extended period they would convey said land, and induced by such representations and relying upon same, Cook and his associates continued to work on said land and prospect for minerals, and did in said period of six months succeeding the expiration of the year mentioned in said lease expend four thousand dollars without return.

That during said period of six months Cook and associates concluded to complete the purchase of said land, and caused to be organized the defendant Presidio Mining Company, with a capital of 100,000 shares, and on December 8, 1883, tendered to said Shafter, Wilhelmi, Spencer, and also to said J. L. Bullis, ten dollars for each acre of land in said survey and one-fifth of the capital stock of said corporation.

That Shafter, Wilhelmi, and Spencer accepted the tender and made a conveyance of their three-fourths interest in said land to defendant company, but Bullis and wife declined said tender.

That the refusal of Bullis and wife to accept said money and stock and make a transfer of their interest in said land operated as a fraud upon the defendant corporation.

Further, that on or about June 1, 1883, Seth Cook and William Willis, acting for themselves and their associates, being in possession of said section 8, and engaged in working same for the purpose of ascertaining its value for minerals, and said Bullis, made an oral agreement, which was reduced to writing but not signed by the said Bullis, and which agreement is as follows:

"This agreement, made this —— day of ——, A. D. 1883, between William R. Shafter, Louis Wilhelmi, John W. Spencer, of Presidio County, State of Texas, and J. Bullis and Alice Bullis, his wife, of Bexar County, said State, of the first part, and Seth Cook and William Willis, of San Francisco, State of California, of the second part, witnesseth: That the said parties of the first part, for and in consideration of the sum of $1, to them in hand paid by the parties of the second part, the receipt whereof is hereby acknowledged, for themselves, their heirs, executors, administrators, and assigns, do hereby grant, covenant, and agree to and with the parties of the second part, their heirs, executors, administrators, or assigns, that they, the parties of the first part, will, by their deed or deeds, good and sufficient in the law, grant, bargain, sell, and convey to the parties of the second part, their heirs or assigns, free from encumbrance, all and singular the following described mineral lands, situated in Presidio County, State of Texas, to-wit: Survey No. 8, block No. 8, surveyed for the Houston & Texas Central Railway Company, beginning at the northeast corner of survey No. 6, made for the Houston & Texas

Central Railway Company, thence east nineteen hundred (1900) varas, thence north nineteen hundred (1900) varas, thence west nineteen hundred (1900) varas, thence south nineteen hundred (1900) varas, to the place of beginning, with the hereditaments and appurtenances, upon the payment by the parties of the second part to the parties of the first part, at the San Antonio National Bank, in the city of San Antonio, State of Texas, at or before the hour of 4 o'clock in the afternoon of the 8th day of December, A. D. 1883, of the sum of $10 per acre for each acre of said land, and the delivering, at the place aforesaid, and at or before the date aforesaid, of certificate, properly issued or endorsed, for one-fifth of the shares of the capital stock of the corporation, to be organized under the laws of the State of California, for the purpose of acquiring and holding said mineral lands, of working in and upon the same, and of reducing the ores therefrom. The capital stock thereof shall not be divided in any number of shares less than one hundred thousand, and which said shares, so delivered to the parties of the first part, shall not be subject to any assessment until all the necessary machinery is erected and paid for, and the mine placed on a paying basis and a dividend declared from the net earnings.

"The parties of the second part are granted and vested with the possession and right of possession of said mineral lands for and during the period aforesaid, and the right and privilege of working on, prospecting, and developing the same, and of extracting and taking away, transporting, and causing to be reduced ore, rock, and earth therefrom in quantities sufficient for milling and furnace test. The failure of the parties of the second part to make the payment and to deliver the certificates for the shares of stock aforesaid, or either, shall be a forfeiture of any right on their part to the deed aforesaid, and deemed an abandonment by them of this agreement, and election on their part to decline the option herein given them to complete the purchase of said land; and thereupon they will surrender any possession they may have of said premises and of all their workings thereon, free of any debt incurred by them, and this agreement and all liability hereunder shall cease and determine.

"In witness whereof the said parties hereto have hereunto set their hands and affixed their seals the day and year first herein written.

> "WM. R. SHAFTER,
> "LOUIS WILHELMI,
> "J. W. SPENCER,
> "SETH COOK,
> "WILLIAM WILLIS."

The following additional clause appears in the paper following the acknowledgment of Spencer:

"It is understood and agreed that the parties of the first part do not

warrant the title by them to be granted to the aforesaid premises against any title or claim other than their own, nor will they be responsible to the parties of the second part for any damages arising out of the assertion of any such other title.

" As witness the hands and seals of the parties hereto, at San Francisco, this 5th day of June, 1883.

"William R. Shafter,
"Louis Wilhelmi,
"Seth Cook,
"William Willis."

That on or about June 1, 1883, Bullis agreed to execute said agreement, and that he would in all respects comply with the terms and the conditions thereof, and that if Cook and his associates could go on with their work in said section 8, he would act in regard thereto just as if said contract was signed by him.

That induced thereby Cook and his associates remained in possession of section 8, and expended various sums of money in working upon and developing and ascertaining the mineral value thereof.

That afterwards Cook and his associates formed a corporation, to-wit, the defendant, and assigned thereto their said agreement, and did thereafter make said tender of money and stock to said Bullis.

That upon the execution of the last agreement by Wilhelmi, Shafter, and Spencer, this defendant continued to work in and upon said land, and did erect all the necessary machinery, and placed the mine on a paying basis, at an expense of $22,000 or thereabouts.

That Bullis had full knowledge of the possession of said land by Cook and his associates and defendant corporation, and saw, without objection, the expenditure of $50,000 by Cook and associates in improving and developing said land.

Defendant prayed for a decree ordering the execution of a deed by said Bullis to his one-fourth undivided interest in said section, or upon his refusal so to do, that the title to such interests be decreed to be in said corporation.

September 26, 1887, plaintiff Bullis filed his second supplemental petition, averring:

A general denial of the allegations of the cross-trial of defendants.

A special denial, that defendants ever performed any one or all the conditions of the lease Exhibit B on or before June 8, 1883, or at any other time; that Cook and his associates expended $24,000, or any other sum, in perfecting and developing the mineral in section 8 before June 8, 1883; that Cook and his associates were induced by plaintiff to continue work on section 8 after June 8, 1883; that plaintiff ever made any representation or request to Cook and his associates, or to defendants.

Further, plaintiff denied any release from the agreement of the obliga-

tions of Cook and his associates concerning section 6, or any waiver of such obligations in any manner, or any extension or promise to extend the time for the fulfillment of the obligations imposed by lease Exhibit B, or any promise to execute the so called extension agreement.

In this pleading plaintiff further alleged that he had always refused to waive any of the stipulations of lease Exhibit B.

That he had refused to extend the time for the performance of its conditions, or to make any new agreement in regard thereto.

That May 30, 1883, upon plaintiff's declining to extend the time for the execution on the part of defendants of Cook's obligation under Exhibit B, the defendants voluntarily abandoned all their rights, duties, and obligations under lease Exhibit B, and voluntarily left off all work and labor on said land, and gave notice to plaintiff that they had "ceased work," but intended to hold possession.

That about that time, or soon afterwards, the identical parties formed another company, called the Cibolo Creek Mill and Mining Company, and became the sole owners of all the stock thereof.

That the organization of the last company was a device to cripple and render valueless stock in the Presidio Mining Company for all time to come.

That with this object defendants, in the name of said Cibolo Creek Company, purchased a tract of land contiguous to section 8, and thereupon erected a stamp mill for the purpose of reducing ore from the mine of the Presidio Mining Company.

That defendants made no effort to secure water in section 8, this section being without living surface water, but on the contrary bought up the nearest and only accessible surface water to section 8 in the name and as the property of the Cibolo Creek corporation, and thus cut off all chances for water to defendant company, and by this action rendered any stock in the Presido Mining Company wholly valueless.

That all these acts of the defendants were in violation of the provisions of Exhibit B; because:

1.  Thereby the shareholders of the Presidio Mining Company were as such deprived of all interest in the stamp mill and other machinery erected to reduce ore in section 8, but not on the land embraced in section 8.

2.  Thereby the Presidio Mining Company was left at the mercy of the Cibolo Company, not only for its productive capacity, but its very existence.

3.  Thereby the Cibolo Milling Company was enabled to charge such tariff in the reduction of ore from the mine of the Presidio Mining Company as to render its output valueless.

4.  Thereby the Cibolo Creek Company was enabled at any time to cut off the water supply from the Presidio mine, not only for mining purposes, but to supply the wants of miners and animals at work in the mine.

And that the said shares of stock plaintiff was to receive under Exhibit B constituted the chief consideration for the making of said lease, Exhibit

B, and that he should not be compelled to received stock that was valueless.

There was a verdict and decree for the defendants.

The evidence in the record as to what was done in and about the performance of the stipulations of contract styled "Exhibit B," and as to whether plaintiff ever agreed to an extension of time, and about what was done by the other contracting parties under the influence of his acts and promises, inducing them to believe that he would not insist upon its forfeiture at the expiration of the time named in said contract, is quite voluminous and somewhat conflicting. It shows, beyond controversy, that Daniel Cook and his associates, Seth Cook, William Willis, and John F. Boyd, had, before the end of the year named in the contract, done much work in the way of prospecting both sections 6 and 8, with the result of satisfying them to abandon section 6, which they accordingly did, with the knowledge and consent of plaintiff, and of leaving them undecided as to section 8, where the prospect was proving much better.

A conflict about the title to section 8 existed. Some negotiations about getting this conflict settled by the withdrawal and cancellation of the adverse title were being conducted by plaintiff, and for a time he was led to believe that it would be done. About the expiration of the year fixed for the performance of the contract, however, plaintiff ascertained that the conflicting claim to the land would not be voluntarily withdrawn, and he shortly afterwards instituted a suit against the parties holding it, which eventually resulted in a judgment sustaining his title.

Plaintiff, previous to the expiration of the year's lease, which occurred on the 8th day of June, 1883, expressed to the agents of the lessees, as well as his own cotenants, his willingness to extend the time for the development of the mine. Each of his cotenants did so, one or more of them being particularly urged by him to consent. Plaintiff testified that he made all such representations under the influence of his belief, from statements made to him by the agent of the owner of the adverse claim to the land, that such claim would be surrendered. He is not contradicted in this respect. There is no controversy as to the fact of his having made known to the agent of the lessees before the year expired that unless the controversy about the title was removed he would not agree to an extension and thereby subject himself to being sued twice—once by the lessees and again by the adverse claimants of the land.

The record makes it clear that the lessees did not comply with the terms of the contract evidenced by Exhibit B, and that all previous negotiations between plaintiff and the lessees were superseded and merged in what here follows:

About the 20th of May, 1883, the defendant William Noyes, acting as agent of the lessees, was furnished by his principals with the paper above set out, and which is referred to in the proceedings as the "extension

contract," for the purpose of procuring to it the signatures of plaintiff and his cotenants. What occurred with plaintiff is detailed in the evidence of said Noyes, and is in substance that he met plaintiff in the road and read to him the paper, and he, replying it was all right, directed the witness to get Spencer's signature to it, and promised to meet witness at Fort Davis and sign it himself. This witness next saw plaintiff at Fort Davis about the 29th or 30th of May, when he declined signing the paper, because the party claiming the adverse title had refused to surrender it, and he was therefore afraid that he would subject himself to a lawsuit from his inability to make title.

Noyes reported the refusal to Willis, one of Daniel Cook's associates in the lease, who was then in California, and about the third day of June received a reply from him by telegraph to the following effect:

"Use every exertion to obtain Bullis's signature to the extension. He agreed with Wilhelmi and Steinberger to sign it, and is honorably bound to do so. Has Spencer signed? Meanwhile cease work and hold possession of the premises until arrival of Steinberger some time in June."

Witness showed this telegram to plaintiff, and had another conversation with him about the extension. He said to witness that the company had done well there and he was anxious to have them continue, and he hoped they would not give up, as it would injure the prospects of other property he had there; that he had other property there that he would like to have the company take, and that he would give them any section they wanted on the same terms; but that the title of section 8 being in conflict, he did not want to sign any contract about that until the title was clear, because he was afraid that on the 8th day of December he would not be able to give a title and then the company would sue him.

He then said he would sign an agreement provided the company would insert in it a clause making him free of any damages if his title should prove imperfect. He said he would sign the extension agreement read to him as above if a clause to that effect should be inserted in it.

Witness then, on June 4, sent a telegram to Willis, having first shown it to plaintiff, who said it contained his proposition. It was in the following words:

"Bullis will not sign second contract, but offers to sign one contingent on his success in suit to settle title, which he will bring immediately. In other respects, says contract is satisfactory. If his proposition is accepted, forward papers to him at 423 South Flores Street, San Antonio."

Willis answered this telegram as follows:

"New contract in accordance with your telegram will be forwarded to Bullis at San Antonio by June 14."

Witness testified that he said to plaintiff: "Provided we go on with this mine, will you agree to act, as regards Seth Cook and William Willis, just as if that contract had been signed?" to which he answered, "yes."

"Will you promise me that you wont, at any future time, take advantage of the fact or raise the question of my not tendering you the money?" He answered, "yes."

The last conversation the witness had with plaintiff prior to his departure from the mine was, witness states, when plaintiff was ready to leave, when he asked him about the contract, and plaintiff replied that he would sign it when he got to San Antonio, if he received it with the exemption clause added; that he then said that he hoped the company would continue prospecting, and not give up section 8. The first time witness heard of plaintiff's objecting to the continuation of the company's possession of and working said section was in July, 1884.

Plaintiff's own evidence shows that he received the paper styled the "extension contract," with the added clause in it, at San Antonio about the 10th day of June.

On the 27th of June, 1883, plaintiff returned the agreement to William Willis unsigned by him, and with a letter assigning the refusal of the parties claiming a conflicting interest in the land to surrender it as his reason for refusing to sign the proposed contract.

Shafter, Wilhelmi, and Spencer signed the paper called the extension agreement, and subsequently conveyed their interest in the land to the Presidio Mining Company.

The money and stock stipulated by the said agreement were paid to Shafter, Wilhemi, and Spencer, and on the 8th day of December, 1883, sixteen hundred dollars in money and five thousand shares of the stock of the Presidio Mining Company were deposited for plaintiff in the San Antonio National Bank, to be delivered when he should make to the mining company a deed for his interest in the land that should be satisfactory to the attorney of the mining company.

On the first appeal this court virtually decided that section 8 was the community property of Bullis and wife, and not the separate property of Mrs. Bullis, as plaintiffs then contended. It was also then decided that time was of the essence of the contract evidenced by the paper styled Exhibit B. This court then approved a charge virtually holding that the time for the performance of the original contract could be extended by a verbal agreement. This view of the law is, we think, sustained by the authorities referred to in the brief of appellees' counsel. Cummings v. Marshall, 3 Metc., 486; Sternes v. Hall, 9 Cush., 31; Stone v. Sprague, 20 Barb., 509; Baker v. Whitesides, Breese (Ill.), 132.

On this appeal appellant strongly contends that a contract required by the statute of frauds to be in writing can only be extended in writing, and cites authorities to sustain that view.

On the other hand, appellees contend for what we consider the better sustained proposition, that the time for the performance of such an undertaking may be extended by a verbal agreement.

It seems to us, however, quite clear that whatever negotiations and representations there may have been between the parties previous to the proposal made by appellees to appellant that he should sign the second contract, they were not considered satisfactory by either party, and were not acted upon by either.

It is beyond dispute that after all such representations had been made appellees caused to be prepared and presented to appellant for his signature the paper called by them the "extension contract," as embodying their proposition and agreement.

Appellant, before the expiration of the time limited by the first contract, refused to sign the new one, and then, and because of such refusal, appellees ordered the work to be stopped, and continued to negotiate with appellant, not to get him to extend the time mentioned in the original contract, but to induce him to sign the new one.

The pleadings of appellees clearly show, we think, that they base their defense as well as their right to recover in their cross-action upon appellant's promise to be bound by the terms of the contract mentioned in the so called extension paper, and to execute it as it read when the final provision releasing him from warranting his title was added.

We may add that we think it is clear that the case made by the evidence shows that the reliance of appellees was not based on any promises or representations made by appellant previous to the presentation to him of the second contract for his signature, but upon his oral promise to sign the second contract; and that instead of appellees proceeding to expend money and develop the property after the expiration of twelve months, on the faith of representations made by appellant previous to the presentation to him of the second contract for his signature, they ceased to prosecute such work, and distinctly announced to him that they would not proceed with it except upon the terms mentioned in the second contract, nor unless he would bind himself to that.

The negotiations of the parties culminated in the offer by appellees to appellant of the paper called by them the extension contract, and the controlling question in the case is, Did appellant bind himself to perform the terms of that contract?

Whatever negotiations, representations, or promises may have been previously made, they can not have a controlling, or indeed any, effect upon the decision of this case.

The appellant never signed the second contract, and if it was of such a nature that he did not become bound by its provisions by promising to sign it, or by promising to perform them without signing it, the jury should have been so instructed. We do not think that the question simply was, whether the time for performance of the original contract had been extended for six months.

If appellees were satisfied with the terms of the original contract, and

only desired further time to determine about accepting it, it would have been easy for them to so specify, and to confine their proposition for an extension to that purpose.

A comparison of the two contracts will show that they did not do that. It is evident to our mind that they not only wanted a longer time, but they wanted a different contract, which they proposed to procure under the guise of an extension.

The terms of each contract are distinct and complete within itself. The second contract not only does not depend upon the first for its application or construction, but it no more refers to it than if the first never had existed. The second party in the first contract is Daniel Cook; in the second the parties of the second part are Seth Cook and William Willis. The first contract has reference to two sections of land; the second to only one. The first stipulated that the party of the second part should create and convey to the first party stock in two corporations, without specifying under what jurisdiction they should be created; while the second undertakes to create and convey stock in one corporation, to be created under the laws of the State of California.

The first gives to the second party possession of the property until the eight day of June, 1883, "for the purpose of prospecting and developing the lands for mineral." The second grants the possession to the parties of the second part until four o'clock in the afternoon of the eighth day of December, 1883, with the "right and privilege of working on, prospecting, and developing the same, and of extracting and taking away, transporting, and causing to be reduced ore, rock, and earth therefrom, in quantities sufficient for milling and furnace test."

The first contract stipulated that if the second party concluded not to complete the purchase, he would "surrender possession to the parties of the first part, with all work and improvements placed on the same, free of all expense to the parties of the first part;" while the second provided that if the second parties declined the option given them to purchase, they would "surrender any possession they may have of said premises, and of all of their workings thereon, free of any debt incurred by them, and this agreement and all liability hereunder shall cease and determine."

Appellees claim performance now by reason of a deposit of money and shares for plaintiff in a San Antonio bank, a privilege given them by the second but certainly not existing under the first contract.

We feel compelled to treat the second contract as a distinct and independent undertaking and not a mere agreement for the extension of the time of performance of the first one. So treated, we think it was clearly within the statute of frauds, and appellant not having signed it was not bound by it.

Appellant requested the court to charge the jury "that the paper before you in evidence, called variously an extension of contract and also

a new contract, not being signed by plaintiff, is in law no contract so far as John L. Bullis is concerned."

The court refused to give the charge, and committed, we think, an error, not only in the particular instance, but in every instance when in different form the same question was passed upon.

Without considering it useful to mention in detail the charges given by the court and discussed as objectionable in appellant's brief, we think it sufficient to say that the right of defendants to recover under the pleadings and evidence now shown by the record ought not to have been predicated in the instructions to the jury upon any representations or promises made by appellant previous to the negotiations with regard to his signing the paper designated the extension agreement.

The court charged the jury, "that if you believe from the evidence that John L. Bullis, before or after the time mentioned in said Exhibit B, represented to the agents of defendants that he would extend the time of the performance of the conditions of said instrument for six months, and that defendants, acting upon said statements and promises and induced thereby, during the said six months did continue to work and develop said mine, and did at the expiration of said six months comply with the terms of said contract by forming said corporation and issuing one hundred thousand shares of stock, as required in said instrument, and did at said time tender to said plaintiff, or to said Alice Bullis, the wife of said plaintiff, the said amount of five thousand shares, and the sums of ten dollars per acre for each acre of plaintiff's fourth interest in said section 8, in block 8, and you further find that section 6, mentioned in Exhibit B, was abandoned as above explained, then you will find that plaintiff is estopped from taking advantage of defendants' nonperformance of the conditions of said Exhibit B in that regard by the express terms thereof; in which case you will find for the defendants."

This charge is objected to because of the direction to consider representations made after the time mentioned in Exhibit B, and because of its reference to the "express terms of Exhibit B," when that paper contains no such terms. In view of the fact that all of the evidence relates to a time before and none to a time after June 8, 1883, the first objection may be treated as pointing out an immaterial error. The other objection points out an error that may have exercised a material influence on the verdict.

As Exhibit B does not contain any express terms estopping appellant from taking advantage of defendants nonperformance of its conditions, the jury may have believed that this charge authorized them to look to the paper called the extension contract to find such terms. In fact the verdict found by the jury, in the following language, "We the jury find for defendants, they to pay plaintiff $1600 purchase money and 5000 shares of stock in the Presidio Mining Company, according to contract

extension (Exhibit B)," indicates that the jury looked at the second agreement as being part of the first one.

We can see no proper application to the real issues in this cause of so much of this part of the charge as in general terms refers to defendants continuing to work and develop the mine during six months extended time on account of inducements and promises made by plaintiff.

We do not understand defendants' pleadings as setting up a case for the specific performance of a verbal contract to convey land; nor do we find in the evidence a state of facts authorizing such a decree.

This charge, if it was upon that issue, would be entirely insufficient, and upon any other aspect of the case, as now presented, it was inapplicable and misleading.

As the pleadings of both parties treated the undivided interest in the land sued for by appellant as his community property, it was not error for the court to charge, as it did, that it was community property. The court ought not to make an issue not made by the pleadings.

It is complained that the court erred in charging the jury to find in favor of both plaintiff and defendants against the heirs of Mrs. Bullis, who having been made parties and duly cited made default. We find no error in this. They do not complain.

The court charged the jury in substance that if defendants found section 6 was worthless for mining purposes, and work on it was abandoned by Cook and his associates with the knowledge and consent of plaintiff, and that he led Cook and his associates to believe that said section 6 was eliminated from the contract, they should consider it as so eliminated.

We think this charge was correct.

The charges on the subject of section 6 were as favorable to appellant as he had a right to ask.

We fail to comprehend what proper connection the building of a mill by another corporation, organized by defendants, upon another section of land than the one in controversy can have with the issues in this case.

The fact that defendants may use their controlling influence in the corporation formed for the purpose of working the mine on the land in controversy to prevent a mill from being erected upon it, so as to enable them to divert the profits of milling the ore found on it to a mill entirely owned by themselves, does not affect the question. The remedy for a wrong of that character must be sought, if at all, when it arises.

We do not think that the objections to the form of the verdict are well taken.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Delivered November 19, 1889.


Motion for rehearing taken to Galveston and overruled March 11, 1890.